22CA1267 Peo v Tewolde 08-21-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1267
Arapahoe County District Court No. 19CR1290
Honorable Michelle A. Amico, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Youhannis Kesete Tewolde,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Gomez and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 21, 2025

---

Philip J. Weiser, Attorney General, Patrick A. Withers, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kelly A. Corcoran, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1　Defendant, Youhannis Kesete Tewolde, appeals his convictions of vehicular assault, menacing, and third degree assault. We affirm the judgment.

## I. Background

¶ 2　Late one night in April 2019, Tewolde and the victim got into a fight in the parking lot of an event center. Two of the victim's friends saw the unconscious victim on the ground and Tewolde standing over him yelling, "I'll kill him, it's not done, I'm not done." As the friends helped the victim, Tewolde walked to his car and yelled, "I'll kill you" multiple times. Shortly thereafter, Tewolde drove his car into the victim and injured him.

¶ 3　The state charged Tewolde with attempt to commit first degree murder, two counts of first degree assault, vehicular assault, menacing, and two counts of crime of violence sentence enhancers. A jury found him guilty of vehicular assault, menacing, and third degree assault, and acquitted him of the remaining charges. The court sentenced Tewolde to three years of probation.

¶ 4　On appeal, Tewolde contends that the trial court violated both his statutory and constitutional speedy trial rights. He also argues that one of the prosecutor's peremptory strikes was racially

motivated in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). We discern no errors and affirm the judgment.

## II.    Statutory and Constitutional Speedy Trial

### A.    Statutory Speedy Trial

¶ 5    Tewolde's contention that his speedy trial rights were violated centers on the first trial setting (October 19, 2020), at which defense counsel refused to comply with the county's COVID-19 social distancing restrictions.  He argues that he was forced to choose between his right to a speedy trial and his right to counsel.  Consequently, he asserts that this choice rendered his waiver of speedy trial involuntary.  Alternatively, Tewolde argues that even if his waiver was valid, the delay should be chargeable to the court and not him.  We address each contention separately.

### 1.    Relevant Facts

¶ 6    On July 16, 2020, Tewolde pleaded not guilty, making the statutory speedy trial deadline January 18, 2021.  The court set trial for October 19, 2020.

¶ 7    As discussed further in Part II.A.3., on October 19, 2020, defense counsel objected to the seating arrangement mandated by the COVID-19 social distancing restrictions, so Tewolde waived his

speedy trial right, and the court reset the trial to December 14, 2020. The court noted a new speedy trial deadline of April 19, 2021.

¶ 8 On December 4, 2020, the trial court declared a mistrial due to COVID-19. Tewolde moved to dismiss for a violation of speedy trial. He argued that he had not voluntarily waived his right to speedy trial in October and that the speedy trial deadline remained January 18, 2020. The court denied the motion and reset trial for February 1, 2021.

¶ 9 At the January 26, 2021, readiness conference, the court again declared a mistrial due to COVID-19 and reset trial for April 19, 2021.

¶ 10 On April 15, 2021, the prosecutor moved for a continuance due to witness unavailability. The trial court granted the motion and reset trial for May 24, 2021.

¶ 11 On May 18, 2021, Tewolde asserted his right to a speedy trial while also requesting substitute counsel. Following a hearing, the court appointed substitute counsel. New counsel moved to continue the trial, and Tewolde waived his right to a speedy trial.

The court granted the motion, reset the trial for September 27, 2021, and noted a new speedy trial deadline of November 24, 2021.

¶ 12 On September 24, 2021, Tewolde again requested substitute counsel. The court granted the request, new counsel moved to continue the trial, and Tewolde waived his speedy trial right. The court reset the trial for January 10, 2022, and noted a new speedy trial deadline of March 28, 2022.

¶ 13 On January 4, 2022, the court again declared a mistrial due to COVID-19. Tewolde objected. Trial was reset for March 14, 2022, and the trial court calculated a speedy trial deadline of June 6, 2022.

¶ 14 On March 10, 2022, the trial court declared a mistrial on its own motion because Tewolde's interpreter was unavailable for the March 14 trial date. Tewolde's trial began on April 18, 2022, before the June deadline.

### 2. Standard of Review and Applicable Law

¶ 15 We review the trial court's denial of a motion to dismiss for violation of the defendant's speedy trial rights as a mixed question of law and fact. *People v. Curren*, 2014 COA 59M, ¶ 13. We will not disturb the court's factual findings if they are supported by the

4

record.  *Id.*  But we review de novo the court's application of the controlling legal standard.  *Id.*  We review the court's decision whether to declare a mistrial for an abuse of discretion.  *People v. Eason*, 2022 COA 54, ¶ 29.  A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair.  *People v. DeAtley*, 2014 CO 45, ¶ 13.

¶ 16    Section 18-1-405, C.R.S. 2024 guarantees criminal defendants the right to a speedy trial.  *People v. Kirby*, 2024 COA 20, ¶ 15 (citing *People v. McMurtry*, 122 P.3d 237, 240 (Colo. 2005)).  Specifically, the statute requires that a defendant be brought to trial within six months of entering a guilty plea unless the time for trial is extended or tolled for one of several statutorily specified reasons, § 18-1-405(1), including, as relevant here:

- a defense-requested trial continuance resets the six month deadline, *see* § 18-1-405(3);

- a mistrial tolls the six-month deadline for up to three months, *see* § 18-1-405(6)(e);

- any delay "caused at the instance of the defendant" tolls the six-month deadline, *see* § 18-1-405(6)(f); and

- a prosecution requested continuance tolls the deadline if, despite the prosecution's best efforts, evidence is unavailable but likely will become available, *see* § 18-1-405(6)(g)(I).

¶ 17 During the COVID-19 public health crisis, our supreme court amended Crim. P. 24(c)(4) to permit a trial court on its own motion to "declare a mistrial in a case on the ground that a fair jury pool cannot be safely assembled in that particular case due to a public health crisis or limitations brought about by such crisis."

¶ 18 "[W]hen a trial court declares a mistrial, including under Rule 24(c)(4), the only delays excludable from the computation of time within which a defendant must be brought to trial are those that are: (1) reasonable, (2) attributable to the mistrial, and (3) not in excess of three months." *People v. Sherwood*, 2021 CO 61, ¶ 26. "[T]he entire delay between the mistrial and the new trial date . . . [is] properly excluded from the speedy trial period." *Id.* at ¶ 28.

¶ 19 A defendant may waive a statutory right, and such a waiver need only be voluntary to be valid. *People v. Wiedemer*, 852 P.2d 424, 438 (Colo. 1993). A defendant's waiver is voluntary when it is not coerced "either physically or psychologically." *People v. Walker*,

2014 CO 6, ¶ 16 (quoting *People v. Mozee*, 723 P.2d 117, 121 n.4 (Colo. 1986)).

### 3. Voluntariness of Waiver

¶ 20　Tewolde first contends that his speedy trial waiver on October 19, 2020, was neither knowing nor voluntary and thus, that speedy trial expired on January 18, 2021. He argues that the court forced him into a "constitutionally offensive" choice between two constitutional rights, rendering any waiver ineffective. We disagree because the record does not support this contention.

¶ 21　On October 16, 2020, Tri-County Health[1] issued an order stating that individuals participating in gatherings "must follow all public health laws and orders concerning Face Coverings and must comply with Social Distancing Requirements whenever possible." However, when the parties appeared for trial, defense counsel requested that he, his paralegal, and Tewolde be permitted to sit at counsel table. Counsel explained that he would not be able to proceed to trial with the six-foot distancing requirement and that such requirement violated Tewolde's right to a fair trial and effective

---

[1] Tri-County Health was a public health agency that served Adams, Arapahoe, and Douglas counties.

assistance of counsel. The court explained that the trial could only proceed if they followed the order. The following colloquy then occurred:

> COURT: The Court would take as many breaks as necessary for counsel to communicate with his client, communicate with his investigator. I don't find that taking more breaks to allow that communication to occur would affect Mr. Tewolde's right to a fair trial under the Constitution. So is the request being made to continue the trial with a waiver of speedy trial?
>
> DEFENSE COUNSEL: I'm not going to waive speedy trial, but I'm not going to trial today.
>
> COURT: Then we'll proceed today, and we'll comply with the social distancing guidelines or be subject to contempt.
>
> DEFENSE COUNSEL: I understand that, Judge. And I will be held in contempt.
>
> COURT: Pardon me?
>
> DEFENSE COUNSEL: I'll be in contempt.
>
> COURT: [Defense counsel] are you telling me that you are not going to comply with the Court's order today?
>
> DEFENSE COUNSEL: That's correct. I'm not going to comply with the Court's order.

¶ 22    After a brief recess, defense counsel maintained his position

and asked the court to speak with Tewolde regarding speedy trial.

> COURT: Mr. Tewolde, we're in a situation today that's difficult.  That's not the result of any one person in this courtroom, but the result of a pandemic that no one thought we'd be facing.  You have the right to have trial today.  I can give you that trial today.  I have jurors downstairs waiting to hear your case today.
>
> I am obligated to follow Tri-County Health's orders with respect to social distancing.  Meaning during this trial everybody in this courtroom will have to maintain six feet of social distancing.  The jurors will be spread six feet out around the courtroom.  We've approved this arrangement with Tri-County Health.  So we can't make any changes today to the trial.  And we can't go forward unless we follow Tri-County Health's Orders.
>
> You have the right to a speedy trial.  You also have the right to effective assistance of counsel.  And your attorney is saying that he's not going to be able to effectively represent you if he can't be within six feet of you or your investigator during the trial consistently.
>
> So you have a choice to make.  We can either go forward to trial today and I would enforce the social distancing requirements.  You could also request a continuance of your trial to a date uncertain.  I mean, we would give you a date, but I don't know what the state of our global health pandemic will be in, and I don't

9

know what Tri-County Health's orders will be when we're scheduled for our next trial.

If you request a continuance of the trial, and I were to grant it, it would require you to waive your right to a speedy trial. Meaning the District Attorney would have six months from today's date to try your case. It doesn't mean that we would set your case out that far. I'd try to set these cases as quickly as possible. And I'm aware of the fact that you've been in custody for a long time. So I would try and try your case sooner, rather than later in that six-month period. But it would give the District Attorney the right to – or the ability to try your case within those six months.

Do you understand the rights that you have and the choices that – the options that you have today?

TEWOLDE: Yes. Yes, Your Honor.

COURT: What do you want to do, Mr. Tewolde?

TEWOLDE: I object, but I would do it to get my attorney from jail. I would waive the speedy trial to keep him out of jail.

. . . .

COURT: Has anybody forced you, or coerced you, or put pressure on you to get you to make this decision?

TEWOLDE: No, Your Honor.

COURT: Are you thinking clearly today.

. . . .

10

> TEWOLDE: Yes, Your Honor.
>
> COURT: Are you under the influence of any drugs, alcohol, or medications which affect your ability to think clearly?
>
> TEWOLDE: No, Your Honor.

¶ 23    The prosecutor then requested further clarification concerning the waiver.

> COURT: And then to clarify, Mr. Tewolde, you said that you are willing to waive speedy trial because you don't want – you're concerned that your attorney may go to jail for violating the Court order?  Is that your reason?
>
> TEWOLDE: Yes, Your Honor.
>
> COURT: The Court will find it's a knowing and voluntary waiver of the right to a speedy trial, free from coercion.  No one has forced Mr. Tewolde to waive his right to a speedy trial, or coerced him.  It's the facts that are present. And he's making a choice between a number of bad options.  But I do find it's a knowing and voluntary choice that he's making.

¶ 24    The prosecutor expressed concerns about the validity of Tewolde's waiver, and defense counsel asserted that the constitutional right to effective assistance of counsel "trump[ed]" the statutory speedy trial right.

¶ 25    The court responded:

11

COURT: Whenever, somebody's faced with a choice to waive speedy trial, it's usually the result of some reason, whether a witness didn't show up and they would like to – the Defendant would like to have that witness present for his trial, or isn't feeling well, or whatever the reason.

In this case, it's a unique reason. The reason is that we can only go to trial, under Tri-County Health orders, if everybody maintains six feet of social distancing. It's difficult. It's difficult to try a case that way. I understand that. And it may be the desire of a defendant to want to be able to be within six feet of his attorney, to have his attorney six feet – within six feet of his paralegal, and that's a choice he can make.

His attorney has stated that – in no uncertain terms, that he will not follow the Court's order to maintain social distancing because he does not believe that he can be effective and to do so.

I didn't threaten jail. That's not – I don't think Mr. Tewolde is making a choice, and I want to make sure. Mr. Tewolde, you're not making this choice because you think that I've said that I'm going to put your attorney in jail, if you don't make this choice; is that right?

TEWOLDE: Yeah, I want him to represent me, so – and if he don't – if he don't follow the rule, you're going to find him in contempt. And I don't want him to be in any trouble.

COURT: He may be unavailable. He said that he's not going to try this case if he has to follow the rule. Which means you may not

12

have an attorney able to help you out during the trial, if we go forward today and he doesn't follow that rule.

Now, you have the right, I guess, to go without an attorney. But you're telling me that you want to have [defense counsel] with you during this trial; is that right?

TEWOLDE: Yes, Your Honor.

COURT: Do I understand you correctly, that that's your reason for wanting this continuance and your willingness to waive speedy trial, so that [defense counsel] can be physically present and represent you, and be helpful during this trial?

TEWOLDE: Yes, Your Honor.

COURT: Again, I find there's a knowing and voluntary waiver. It's a difficult choice for any defendant to make. He's making this choice based upon how the trial would look, if we were to proceed under the social distancing guidelines.

¶ 26    We discern no error in the court's advisement and conclude that Tewolde's decision to waive speedy trial so that counsel would continue to represent him was voluntary. Defense counsel's refusal to try the case under the county's restrictions left Tewolde with two options. He could either go forward without counsel (and preserve his speedy trial right) or request a continuance to accommodate counsel's concerns, which required him to waive his speedy trial

13

right. Contrary to Tewolde's contention, it was counsel's actions, not the court's or the prosecutor's actions, that forced this choice. Thus, the court's requirement that Tewolde decide between these choices was necessary under the circumstances. Moreover, the record shows that the court provided Tewolde with a lengthy advisement and clarified the choices he faced. *See People v. Arguello*, 772 P.2d 87, 93-96 (Colo. 1989) (to determine whether waiver is voluntary, the court must undertake a sufficient inquiry); *see also Pazden v. Maurer*, 424 F.3d 303, 313 (3d Cir. 2005). Indeed, Tewolde acknowledged that he understood that a waiver reset the statutory speedy trial clock, and he responded "no" when the trial court asked if his decision was the result of coercion. Based on the lengthy colloquy and the absence of anything in the record to suggest Tewolde was confused, we conclude that his wavier was voluntary.

¶ 27    For the same reasons, we reject Tewolde's assertion that the delay was chargeable to the trial court rather than the defense. As previously discussed, it was defense counsel's refusal to comply with the county health department guidelines that created the

14

choice about which Tewolde now complains. And the record shows that the court was willing to proceed with the trial.

¶ 28      We are not persuaded otherwise by Tewolde's reliance on *People v. Arledge*, 938 P.2d 160 (Colo. 1997). In *Arledge*, the defendant filed a Motion to Disqualify the trial judge. *Id.* at 162. The trial judge originally denied the motion, but five weeks later, and one business day before trial, the court granted the motion and obtained the defendant's speedy trial waiver. *Id.* The supreme court concluded that the recusal motion was brought in a timely manner, and the disqualification issue was later reopened by the trial judge. *Id.* at 166. In other words, the defendant did not actively participate in causing the delay. *Id.* Thus, the court could not require a speedy trial waiver, and the delay was chargeable to the trial court. *Id.*

¶ 29      In contrast, to *Arledge*, defense counsel here actively participated in causing the delay. Therefore, we conclude the delay is chargeable to the defense and conclude that speedy trial did not run on January 18, 2021.

¶ 30      Given our conclusion that Tewolde's waiver on October 19, 2020, was knowing and voluntary, we conclude that at no point

between Tewolde's not guilty plea and the trial did the speedy trial deadline expire.

- On October 19, 2020, the speedy trial date was April 19, 2021.

- On December 4, 2020, the trial court declared a COVID-19 mistrial, so speedy was tolled. At this point, forty-six days had elapsed, and 134 days remained.

- On January 26, 2021, the trial court declared another COVID-19 related mistrial. This tolled the speedy trial deadline with 134 days remaining.

- On April 15, 2021, the prosecutor moved to continue. Speedy trial was tolled with 134 days remaining.

- On May 20, 2021, the trial court substituted counsel, Tewolde waived speedy trial and counsel moved to continue. The speedy trial deadline was reset to November 24, 2021.

- Again, on September 27, 2021, the trial court substituted counsel, Tewolde waived speedy trial, and counsel moved to continue. The speedy trial deadline was reset to May 27, 2022.

16

- On January 4, 2022, the trial court declared another COVID-19 related mistrial. The speedy trial deadline was tolled. At this point, ninety-nine had days elapsed, and eighty-one days remained.

- On March 10, 2022, the court declared a mistrial on its own motion because of Tewolde's interpreter's unavailability. The speedy trial deadline was tolled. Ninety-nine days had elapsed, and eighty-one days remained.

- Tewolde went to trial on April 18, 2022.

¶ 31 Accordingly, Tewolde's statutory speedy trial rights were not violated.

## B. Constitutional Speedy Trial

¶ 32 Tewolde contends that even if his statutory speedy trial rights were not violated, the significant delay of more than three years between his not guilty plea and the trial date violated his constitutional right to a speedy trial. We are not persuaded.

### 1. Standard of Review and Applicable Law

¶ 33 We generally review the trial court's legal analysis of the constitutional right to a speedy trial de novo and its findings of fact

for clear error.  *People v. West*, 2019 COA 131, ¶ 27.  But here,
Tewolde did not assert his constitutional right to a speedy trial in
the trial court.  We therefore review this issue for plain error.  *See*
*People v. Jompp*, 2018 COA 128, ¶ 14.  Plain error is obvious and
substantial and must be so grave that it undermines the
fundamental fairness of the trial court proceedings as to cast
serious doubt on the reliability of the judgment and convictions.  *Id.*

¶ 34    The United States and Colorado Constitutions guarantee all
criminal defendants the right to a speedy trial.  U.S. Const. amend.
VI; Colo. Const. art. II, § 16; *Moody v. Corsentino*, 843 P.2d 1355,
1363 (Colo. 1993).  We apply a four-factor balancing test to assess
whether a defendant's constitutional speedy trial rights were
violated: (1) the length of the delay; (2) the reasons for the delay;
(3) the defendant's assertion of the right; and (4) the prejudice to
the defendant.  *Moody*, 843 P.2d at 1363 (citing *Barker v. Wingo*,
407 U.S. 514, 530 (1972)); *see also People v. Chavez*, 779 P.2d 375,
376 (Colo. 1989) (noting the *Barker* test also governs the
determination of a speedy trial claim under the Colorado
Constitution).  The defendant bears the burden of establishing that

the defendant's constitutional speedy trial rights have been denied. *Moody*, 843 P.2d at 1363.

## 2. Application

¶ 35 Concerning the first *Barker* factor, we conclude that the more than three-year delay between Tewolde's not guilty plea and the trial is presumptively prejudicial and weighs in Tewolde's favor.

¶ 36 Regarding the second *Barker* factor, Tewolde contends that the reasons for the delay were varied. We agree. However, our review of the record leads us to conclude that most of the delays were either neutral or attributable to the defense and thus, that this factor weighs against Tewolde. The court declared COVID-19 mistrials on numerous occasions, and we view the delays attributable to these mistrials as neutral. *See United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023) (finding that "COVID-19 [is] a truly neutral justification — not favoring either side").

¶ 37 Additionally, on two separate occasions, Tewolde requested, and the court granted, his request for substitute counsel. On both occasions, Tewolde's new counsel requested a continuance to prepare for trial. The delays attributable to these requests weigh against Tewolde.

¶ 38    The remaining delays were due to (1) the unavailability of the prosecution's witness, and (2) the unavailability of Tewolde's interpreter.  Witness unavailability is a valid reason for a delay.  *See Barker,* 407 U.S. at 531 (a valid reason, such as a missing witness, should serve to justify appropriate delay).  Further, despite the delay due to Tewolde's interpreter's unavailability, Tewolde's trial commenced within the speedy trial deadline.  Therefore, this factor weighs against Tewolde.

¶ 39    Concerning the third *Barker* factor, the record shows that Tewolde continually asserted his right to a speedy trial, other than those times where he waived speedy trial to accommodate counsel. Therefore, this factor weighs in his favor.

¶ 40    Concerning the fourth *Barker* factor, we conclude that Tewolde has not shown he was materially prejudiced by the delay.

¶ 41    Prejudice is assessed by weighing three interests that the right to speedy trial protects: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Moody,* 843 P.2d at 1367 (quoting *Barker,* 407 U.S. at 532).  "Of these, the most serious is the last, because the inability of a

defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

¶ 42    Tewolde contends that he was prejudiced by the delay because (1) he experienced anxiety and concern about his prolonged incarceration and (2) because his incarceration occurred during the pandemic, he had particularly limited access to counsel and an inability to prepare his defense.

¶ 43    While we recognize the impact of Tewolde's lengthy incarceration and the unusual circumstances under which they occurred, we note that Tewolde did not explain how the delay caused him any more anxiety or concern than the average criminal defendant, and that he failed to provide any specific examples of how his anxiety, concern, or distress resulted in prejudice. *See People v. Valles*, 2013 COA 84, ¶ 50, *cert. granted on other grounds, judgment vacated, and case remanded*, No. 13SC551, 2015 WL 4999239 (Colo. Aug. 24, 2015) (unpublished order); *see also People v. Nelson*, 2014 COA 165, ¶ 41 (noting that the defendant "presented no evidence or offer of proof to establish any such anxiety or concern beyond that normally to be expected from the fact of a criminal prosecution"). Moreover, Tewolde does not specify

how long he lacked access to counsel, how his limited access to the law library impacted his defense given that he was represented by counsel, or how his defense would have changed had his pretrial detention been shorter. Under these circumstances, we conclude this factor weighs against Tewolde.

¶ 44 Weighing all of the factors, we discern no violation of Tewolde's constitutional right to a speedy trial.

### III. *Batson* Challenge

¶ 45 Tewolde next contends the trial court erroneously denied his *Batson* challenge to G.Y. We are not persuaded.

### A. Additional Facts

¶ 46 G.Y.'s juror questionnaire asked whether there was any reason she could not be a fair and impartial juror, and G.Y. responded, "lack of sleep yes."

The prosecutor asked G.Y. about her answer.

> PROSECUTOR: [G.Y.], I'm going to come back to you. You indicated that you maybe have a lack of sleep and that might affect your ability to serve as a juror?
>
> G.Y.: Yes. Circling back to that, I work with a nursing facility and I work overnights and so I came straight from there to here to serve my jury trial.

22

PROSECUTOR: Thank you for coming, that must be hard.  Think that that would affect your ability to pay attention to the trial?

G.Y.: Well, I had extra coffee, so I think I should be good to go.

¶ 47    Later in voir dire, the prosecutor discussed the elements of the charges and in particular, the deadly weapon element.  He asked another prospective juror if they thought a car could be a deadly weapon, and the juror responded affirmatively.  The prosecutor then asked G.Y. her thoughts.

G.Y.: I disagree.

PROSECUTOR: Why?

G.Y.: I think a weapon becomes a weapon when held by someone with ill-intention.

PROSECUTOR: Let's talk about ill-intention a little bit.

Crimes have – or at least the crimes in this case – have both a mental state and a physical action associated with it.  So when we talk about a mental state, we're talking about somebody acting intentionally or knowingly or recklessly or with negligence, right, those are – the criminal legal world that we're in.

How do you know if someone acted intentionally or how you said, it was ill-intentioned?

G.Y.: You have concrete evidence. There will always be a form of evidence to speak for itself, whether it's witnesses saying this is what I saw or whether it's whatever was used with ill-intention. You'll have that presenting against the person with ill-intentions.

PROSECUTOR: Okay. So you mentioned that you didn't think that like a car, vehicle, could be a deadly weapon?

G.Y.: My words exactly were it could if – it could be providing that the person using it had ill-intentions.

PROSECUTOR: Okay. And can you think of some examples as to how that would be?

G.Y.: Let's say a couple gets in a fight in their apartment and one of them has to be hospitalized and now you're in court having a court case for a completely different reason. One of the couple could say, I used this weapon as self-defense versus the other could say, I used this weapon for this and this purpose.

So then it's up to the – their attorney, their lawyer, to find hard evidence pinpointing whether that person, what they're saying is true or not.

¶ 48    Finally, the prosecutor asked:

PROSECUTOR: Is there anybody here that just says, I don't trust police officers, never will? No matter what they say, I'm not listening to it? Does anybody fall in that category? Show of hands. I see no hands.

Go ahead, [G.Y.].

G.Y.: Not following that, but I have had incidents where I didn't feel like I was treated fairly when pulled over. So maybe it would make me a little skittish, but that wouldn't sway my opinion of choosing whether the person being tried is guilty or not.

PROSECUTOR: Okay. So you'd be able to set those personal experiences aside?

G.Y.: Yes.

¶ 49    Later, defense counsel discussed the burden of proof.

DEFENSE COUNSEL: [G.Y.] do you believe that it is fair that the District Attorney's Office has the burden of proof?

G.Y.: In terms of?

DEFENSE COUNSEL: In a criminal case, all evidence has to come from them. It's their job to try to prove to a jury beyond a reasonable doubt as to whether he's guilty or not, do you think it's fair that it comes from them?

G.Y.: I personally think that both parties should have the right to prove otherwise.

DEFENSE COUNSEL: Okay. How do you prove you're innocent?

G.Y.: Well, if you're representing the person being tried, then you're going to look for hard, concrete evidence pointing to his innocence. And so that's why I'm saying that both parties, whoever is representing them, should have to prove their innocence.

25

DEFENSE COUNSEL: So let's say the prosecution provides all their evidence, okay, and they say, we're done, here's all the evidence that we have, ladies and gentlemen, all right, and Mr. Tewolde and I don't do anything. If they have given you proof beyond a reasonable doubt, what's your verdict?

G.Y.: Well, if you're just sitting there and not doing anything, then how can you be a voice for yourself and that person being tried doesn't get their own voice, you're not going to be the voice – I'm not hearing their voice being represented by you, so I'm saying both parties –

DEFENSE COUNSEL: And I hear you. You should be in philosophy school. And the conversation is awesome.

Legally speaking, though, it is the District Attorney's job to prove a case beyond a reasonable doubt, period, because they're doing the charging, that's their job. They brought the charges, okay.

So if I accuse you of – or if I accuse you or I accuse somebody of doing something, it's my job, does that make sense? Does that seem fair to you or are you still struggling with both sides?

G.Y.: Can you rephrase it in a more simpler term for me? I'm not really understanding.

DEFENSE COUNSEL: Welcome to my life. So the District Attorney's Office, the government, brought the charges, right, they're – they've brought charges against Mr. Tewolde, right, and so it is their job, they're doing – old lawyer

26

that I used to work with, doing the accusing, you got to do the proving. So if they're doing the accusing, they've got to do the proving. Does that make sense?

G.Y.: Yes.

DEFENSE COUNSEL: Are you comfortable with that idea?

G.Y.: Now I am speaking for the fact that they're accusing the person being tried of something, then they have to prove whether guilty or not?

DEFENSE COUNSEL: Thank you.

¶ 50     The prosecutor exercised a peremptory challenge on G.Y., and the defense counsel raised a *Batson* challenge.

¶ 51     When the trial court asked for the prosecutor's race-neutral reason, he responded:

> PROSECUTOR: Your Honor, I want to first begin with what we know from the questionnaire and then how that was expanded upon with questioning of the witness – or the juror – during voir dire as well as some of her responses or lack thereof to both parties.
>
> She did mention in her questionnaire that she has been suffering from lack of sleep. She is a – she works at an advanced-age nursing home as an assistant and said that she works nights and that she had not slept last night and came straight from work after a night shift.

She was asked about that and is displaying clear visual clues, droopy eyes, slow speech, that she is tired, but did mention that she's perked up right now by caffeine, which of course is not an ideal way for a person to be alert and attentive during a criminal trial.

She also responded first to questions from [the prosecutor] specific to what a deadly weapon is. A question was asked in the form of her fellow jurors who said that really anything could be used as a deadly weapon.

We then moved on to [G.Y.] who said that she decidedly disagreed that specifically an item only becomes a weapon – or rather in her words, a weapon becomes a weapon when a person holds it or possesses it with ill-intent.

There's a multitude of problems the People see with that. First of all, it's not our burden to apply the mens rea to just the definition of deadly weapon. The finding of a deadly weapon is separate and apart from that and it's something that this juror has already displayed is difficult for her to reconcile in a way that would raise the People's burden. Of course intent is part of our burden, but not as it relates to just the definition of a deadly weapon.

Additionally, when questioned on – or by [defense counsel] [G.Y.] seemed to really struggle with the concept of the presumption of innocence and beyond a reasonable doubt and who the burden of proof applies to.

Specifically, it was a journey to get her to a position where she seemed to grasp at least partially the idea that the Defense does not

28

have a burden of proof and that they [must not] prove the innocence of the defendant.

In doing that, her confusion around the burden gives the People concern for how she may deliberate, how she may understand her role as a juror, and if she will be able to be assistive and fair to the – to really either party, but especially the People if she was confused about the burden.

The final thing that she had discussed, at one point we had – [the prosecutor] had offered the entire panel, including those not sitting in the jury box, an opportunity to voice if they had any negative opinions specific to police officers.

This witness, or excuse me, this juror did raise her hand. She was the only person, as I recall it, that did raise her hand to answer that question and noted that she feels she's been treated unfairly in the past and would have difficulty trusting a police officer. She specifically said she's a little skittish about police.

A lot of the People's witnesses in this case are police officers and it would be unfair to the People if there was any members of a fair and impartial jury that started a police officer at a lower sense of credibility than any other witness just by virtue of their occupation and before giving them a chance to speak and make an assessment of this where credibility based on the totality of the circumstances, the testimony they give, whether or not this is corroborated by other witnesses, et cetera.

So that being said, the People have four or five legitimate concerns about [G.Y.]'s likelihood to

be a fair and impartial juror and that accounts for 100 percent of the People's rationale and motivation for utilizing a peremptory challenge on her.

Her perception of race, ethnicity, national origin, is not something that came into the People's consideration in any way, shape or form.

¶ 52    Defense counsel then responded:

DEFENSE COUNSEL: First of all, Your Honor, as it relates to the questionnaire, it's pretty bare-boned as it relates to the questionnaire. Some of it was kind of entertaining in the sense that she said that she was broke, but they were answered honestly and openly.

Regarding the lack of sleep, counsel asked her how she was doing. She was – said, I'm doing okay, I have coffee, I'm okay. Asked how, you know, never indicated that there would be a problem. And she's not shy about talking, so she never indicated that there was a problem.

The other part of it, Your Honor, counsel's perception about droopy eyes and all that, I don't see. I can tell you she has not ever closed her eyes, she has not ever gotten – gone to sleep. She's looked down. Even right now she's playing on her phone looks like, but she's looked down, but never given any sort of indication, except being attentive, and she answers the questions that are being asked of her.

Regarding the deadly weapon discussion, Your Honor, the definition of a deadly weapon in layperson's terms is pretty darn close to what

30

she's talking about. A deadly weapon, unless it's a gun or a bludgeon, I don't have the instruction in front of me, the instruction – but basically the instructions themselves talk about the manner in which they are used.

And I apologize, I don't have the definitions off the top of my head as it relates to the COLJI instructions, but it does discuss that the deadly weapon is also in the manner in which it was used. So that's exactly what she's talking about. It doesn't change their burden, it is what the – my reading of the definition talks about.

Struggled with the presumption of innocence, a journey to get there. That's not uncommon. [Juror H] had the same exact – same journey. She just talked about it in different ways in terms of how she'll deliberate. She's thoughtful, she answers the questions, she listens and she answers appropriately.

Regarding the negative aspect to police officers, she was asked – she said she's had incidents where she's not treated fairly. And I will tell you, Your Honor, I don't know many African-American people that don't have some negative interaction with police officers. I'm not saying that all police officers interact negatively with African-American people, but I do not know – that is not an uncommon answer from African-Americans.

However, the most important part of that is what she says is it wouldn't sway me. Those were her words, but that wouldn't sway. That was her word, swayed. And she was not asked anything further about that so she never indicated she would hold those personal

experiences against the government or against the individual witnesses, law enforcement witnesses.

¶ 53    The trial court found:

COURT: The Court would note that the record was made that Mr. Tewolde's descent is African-American, [G.Y.]'s African-American by everyone's observations here in the courtroom. And the only other African-American individual on the panel appears to be, by my observations, [Juror K] who is not yet in the position to have any peremptory challenge exercised.

The People asked the Court to make a prima facie showing first. So what is required with respect to a Trial Court's three-step determination is first the objecting party must make a prima facie showing that the striking party exercised a peremptory challenge on a discriminatory basis.

The Court found a sufficient prima facie showing, given [G.Y.]'s of African-American descent, so is Mr. Tewolde, but notably as soon as she was in the position to be struck, she was – the People exercised a peremptory challenge.

So the Court did ask the People to set forth their race-neutral reason or reasons for exercising the peremptory strike.

The People started with the first reason being – standing on the questionnaire filled out by [G.Y.], pointing out that for question number 10 on the questionnaire, it asked, do you believe there's any reason why you cannot be a

32

fair and impartial juror? She wrote, lack of sleep, yes. And drew an arrow into her questionnaire for, if yes, please give your reasons.

So her questionnaire purports to indicate that may be a reason why she cannot be a fair and impartial juror is lack of sleep.

The People noted that their first reason for exercising their peremptory strike on [G.Y.] was with respect to that lack of sleep and concern about her ability to pay attention or observe during the course of the trial.

The People also made note that her objections were she had droopy eyes during the course of the jury selection process.

And [prosecutor], I wrote down droopy eyes. Were those observations that you made in support of the fact that [G.Y.] was – the People were concerned about her ability to pay attention?

¶ 54    The prosecutor answered, "I also mentioned slowed in speech."

The court then continued:

COURT: Okay. Unfortunately, not a lot was asked about – of [G.Y.] with respect to what was on the questionnaire, but the People did address this in their questioning of [G.Y.] and asked about that and [G.Y.] indicated that she has some type of nursing job or nursing assistant, so she works overnights. So she came here after working overnight.

So the Court does not know if her work schedule will remain the rest of the week. This

33

trial is scheduled to span for several days, but we are scheduled to start this afternoon. So proceeding with opening statements and at least getting to one witness.

The People offered a second reason associated with the exercise of their peremptory challenge which was that they believed that [G.Y.] attached – or associated intent with a definition of a deadly weapon and that they need not prove intent with respect to the actual definition of a deadly weapon.

Her description of the – of what a weapon was appeared to the Court to comport with what the People indicated they had concern about how she defined deadly weapon as related to their ultimate burden of proof.

The People then offered a basis that [G.Y.] may have difficulty with respect to the ultimate burden of proof, that their description was that it was a journey for her to get there and they had concern for her understanding of the burden of proof in terms of ultimate deliberations if she were a seated juror.

. . . .

The final basis upon which the peremptory was exercised was a concern about the fact that [G.Y.] had prior negative experience or experiences with police officers and there would be several police officers that would be testifying.

The People indicated that she was a bit skittish about police. She indicated during her questioning that she had had incidents where she was not treated fairly by police.

34

The Court's recollection was it was in relation to when she was – time when she may have been pulled over, but that she could set her personal experiences aside.

. . . .

[Defense counsel] pointed out that she believed that [G.Y.] was engaged and paying attention during the proceedings, that she had stated – accurately stated a definition of burden of proof associated with a deadly weapon, that she did come around to understanding an ultimate burden of proof, and that prior she indicated that she could set aside prior negative experiences with police.

She also pointed out that there is a female currently still on the panel who had at least a similar issue with respect to what the People characterized as a journey in terms of getting the burden of proof, that's [Juror H], but we're only on the People's second peremptory.

So really the – what the case law appears to direct the Court to do is decide the ultimate question as to whether there has been the establishment of purposeful discrimination.

The Trial Court's three-step ruling should be based on its evaluation of the prosecutor's credibility and the plausibility of the explanations.

And with respect to the ability to pay attention and the ability to understand the burden of proof, or something that would be offered associated with the People's burden of proof, the Court finds those are race-neutral reasons for exercising the peremptory.

35

The explanation must be related to the particular case being tried, so the ability to pay attention is, especially in light of the fact that we are proceeding with the trial today, it need not be persuasive or even plausible, as long as [it] does not deny equal protection. That comes from *People v. Licona-Ortega . . .* 2022 COA 27, and they're quoting to *People v. Rodriguez*, 2015 CO 55.

There are race-neutral reasons which the People have expressed concern, and the People appear credible to the Court in terms of their business bases upon which they wish to excuse [G.Y.]. So I'll permit the peremptory.

### B.   Standard of Review and Applicable Law

¶ 55   The Equal Protection Clause of the Fourteenth Amendment forbids a challenge to a potential juror based solely on race. *Batson*, 476 U.S. at 89; *see also People v. Wilson*, 2015 CO 54M, ¶ 10 n.4. When a party raises a *Batson* challenge, the trial court engages in a three-step analysis to assess the claim of racial discrimination. *Wilson*, ¶ 10.

¶ 56   First, the opponent of the peremptory strike must allege a prima facie case showing that the striking party excused the potential juror based on race. *Id.* As long as the totality of the relevant circumstances raises an inference of racial motivation, the

36

objecting party has satisfied the step-one burden. *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).

¶ 57 Second, the burden shifts to the striking party to provide a race-neutral explanation for excusing the potential juror. *Wilson*, ¶ 10. The striking party need only provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness. *People v. Ojeda*, 2022 CO 7, ¶ 24. The opponent is then given the opportunity to rebut the striking party's explanation. *Wilson*, ¶ 10.

¶ 58 Third, the trial court must decide the ultimate question: whether the objecting party has established purposeful discrimination. *Ojeda*, ¶ 27. In doing so, the court must assess the striking party's actual subjective intent and the plausibility of its nondiscriminatory explanation. *Id.*; *Wilson*, ¶ 10. The trial court's task at step three of a *Batson* analysis is to determine whether the objecting party proved that the striking party exercised peremptory challenges with discriminatory animus. *People v. Rodriguez*, 2015 CO 55, ¶ 12. The decisive question at step three is whether counsel's race-neutral explanation should be believed. *People v. Collins*, 187 P.3d 1178, 1182 (Colo. App. 2008). "In assessing the

credibility of the proponent of the strike, the court may consider a number of factors, including the proponent's demeanor, how reasonable or improbable the proponent's explanations are, and whether the proffered rationale has some basis in accepted trial strategy. *Id.* The ultimate burden of persuasion rests with the opponent of the strike, *Purkett v. Elem*, 514 U.S. 765, 767 (1995), and, for a *Batson* challenge to succeed, the court must find by a preponderance of the evidence that one or more potential jurors were excluded because of race, *Valdez*, 966 P.2d at 590.

¶ 59 The standard of review for a *Batson* challenge depends on which step of the analysis is challenged on appeal. *People v. Friend,* 2014 COA 123M, ¶ 8, *aff'd in part and rev'd in part*, 2018 CO 90. We review steps one and two de novo. *Rodriguez,* ¶ 13. The court's ruling at step three, however, is a factual finding to which "an appellate court should defer, reviewing only for clear error." *Id.*; *see also People v. Beauvais*, 2017 CO 34, ¶ 32. We accord the trial court's ruling "great deference and will only reverse under 'exceptional circumstances.'" *Beauvais,* ¶ 25 (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008)).

## C. Analysis

¶ 60    Tewolde challenges only the trial court's step three findings. We discern no clear error and conclude that the record supports the trial court's findings.

¶ 61    Our supreme court has instructed that "an appellate court conducting a clear error review should defer to a trial court's ultimate *Batson* ruling so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion as to whether the objecting party proved purposeful discrimination by a preponderance of the evidence." *Beauvais*, ¶ 63.

¶ 62    Here, during its detailed ruling, the trial court weighed all the pertinent circumstances, including the prosecutor's reasoning behind the strike and defense counsel's rebuttal. Moreover, each of the prosector's race-neutral reasons has record support.

- G.Y. indicated on her juror questionnaire and during voir dire that she worked nights, which could affect her ability to be fair and impartial.

- G.Y. stated that she did not believe a car could be a deadly weapon because she thought a weapon "becomes a weapon when held by someone with ill-intention."

- G.Y. told defense counsel that "both parties . . . should have to prove guilt or innocence."

- G.Y. expressed feeling "skittish" around police officers because she was treated unfairly during traffic stops.

¶ 63    The trial court found the prosecutor to be credible. We defer to the trial court's credibility finding. *See id.* at ¶ 25 (the trial court is in a far better position than a reviewing court to make credibility determinations).

¶ 64    Tewolde argues that G.Y. repeatedly committed to being fair, remaining alert, and following the law. However, "[w]hen evidence in the record supports a trial court's factual findings, those findings will not normally be disturbed on appeal. . . . Any inference or conclusions drawn by a trial court from such evidence are entitled to similar deference." *Assocs. of San Lazaro v. San Lazaro Park Props.*, 864 P.2d 111, 115 (Colo. 1993). As previously described, the prosecutor's race-neutral reasons enjoy record support and

Tewolde's emphasis on G.Y.'s other statements does not negate this fact.

¶ 65 Finally, we reject Tewolde's contention that one of the prosecutor's stated reasons for striking G.Y. — that she had been treated unfairly by police — was tied to race and would have a discriminatory impact on black jurors. Our supreme court recently addressed this issue in *People v. Johnson,* 2024 CO 35. Like the prosecutor in *Johnson,* the prosecutor here did not tie G.Y.'s perceived distrust of law enforcement to her race. *Id.* at ¶ 43. The prosecutor's explanation was based on G.Y.'s personal experience and how it might affect G.Y.'s ability to consider testimony from police officers. As the supreme court concluded in *Johnson,* this type of individualized reason is facially race-neutral. *Id.* at ¶ 44.

¶ 66 Because the court's findings are supported by the record and were based on its consideration of all the pertinent circumstances, we discern no error.

## IV. Disposition

¶ 67 The judgment is affirmed.

JUDGE GOMEZ and JUDGE MEIRINK concur.